IN THE UNITED STATES DISTRCIT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

DEIRDRE L. BOSTICK,

    Plaintiff,

        v.

CABARRUS COUNTY DEPT. OF
HEALTH AND HUMAN SERVICES,

    Defendant.

BRIEF IN SUPPORT OF DEFENANT'S
MOTION FOR SUMMARY
JUDGMENT

Case No. 1:18CV1042

## STATEMENT OF THE CASE

Plaintiff Deirdre Bostick alleges that Defendant Cabarrus County, North Carolina violated her rights under the Americans with Disabilities Act (ADA). In particular, she charges that Cabarrus County terminated her employment because of her anxiety and claustrophobia and failed to offer a reasonable accommodation. Cabarrus County denies these allegations and believes that Plaintiff's disability claims were an attempt to return her to her preferred work location at the front desk of the Cabarrus County Department of Human Services (CCDHS) after being moved to another location following accusations of unprofessionalism and disruptive behavior.

Defendant Cabarrus County believes that summary judgment is appropriate in this matter because (1) the Plaintiff filed her complaint late; (2) a reasonable jury could not find that Cabarrus County terminated her or took other adverse employment action because of a disability; and (3) Cabarrus County did not fail to offer Plaintiff a reasonable

1

accommodation. As such, the Court should enter summary judgment in favor of Defendant Cabarrus County.

## STATEMENT OF THE FACTS

Cabarrus County first employed Plaintiff on June 6, 2008. Covington Aff. ¶ 1. She held the position of Income Maintenance Caseworker I. Covington Aff. ¶ 9. In this position, Plaintiff helped clients of the Cabarrus County Department of Human Services (CCDHS) apply for and maintain various social service program benefits. Rose Aff. ¶ 8, *see also,* Rose Aff., Ex. A (job description). This job was performed at the front desk of the Customer Service Center, where caseworkers would help clients who visited CCDHS in person. The same job was also performed in the Customer Service Center's call center (also referred to as the switchboard). *See* Rose Aff. ¶ 8.

As an Income Maintenance Caseworker I, customer service and teamwork were essential aspects of her position. Plaintiff's duties included "[Greeting] all incoming clients/visitors coming/calling into the Agency in a professional customer friendly manner." Covington Aff. ¶ 10. Caseworkers were also required to rotate to "other areas of the Customer Service Center, including Call Center, Mail Room, and Front Desk in order to complete casework changes/duties for active NCFAST cases." Covington Aff. ¶ 10.

While generally proficient in the technical aspects of her position, Plaintiff accumulated several disciplinary warnings stemming from incidents of providing bad customer service to clients and a poor working relationship with her coworkers:

2

- On May 28, 2009, Ms. Bostick received a written warning for unacceptable personal conduct stemming from two incidents in which she acted rudely and unprofessionally towards members of the public while working at the front desk of CCDHS. Covington Aff. ¶ 11.

- On June 29, 2009, Ms. Bostick was issued another written warning for "unacceptable personal conduct" stemming from her use of government time and resources to handle personal business and numerous instances of unprofessional conduct while serving at the front desk of CCDHS. Covington Aff. ¶ 12.

- On January 22, 2010, Ms. Bostick was issued a written warning for "unacceptable personal conduct" stemming from her use of government time and resources to handle personal business. The warning also addressed several instances of unprofessional conduct while working at the front desk. Covington Aff. ¶ 13.

- On August 17, 2012, Ms. Bostick received a written warning for conduct unbecoming of a public employee after being observed having an aggressive verbal conflict with a member of the public in the CCDHS parking lot. Covington Aff. ¶ 14.

- On March 14, 2014, Plaintiff received another warning for unacceptable personal conduct, unsatisfactory job performance, calling out sick after being

denied vacation leave, and conducting personal business at the front desk. Covington Aff. ¶ 15.

Plaintiff also has a history of alleging employment discrimination when disciplined. On April 3, 2014, Ms. Bostick received a written response to a grievance she submitted on March 25, 2014. In her response, Plaintiff alleged that the warning given to her on March 14, 2014 was unjust and created a hostile working environment. Covington Aff. ¶ 15.

On September 14, 2017, Plaintiff was placed on non-disciplinary suspension for investigatory purposes due to multiple allegations of "creating a hostile working environment for co-workers and clients." Covington Aff. ¶ 15 (quoting Ex. H), *see also*, Rose Aff. ¶ 11.

On September 18, 2017, after CCDHS manager met with Plaintiff, Plaintiff received a written notice of findings from the investigation. In part, the investigation found that there "is an obvious dysfunction and tension between [Plaintiff] and other staff members within the front desk area, which is creating an uncomfortable working environment and risking customer service to [CCDHS] clients." Based on these findings, Ms. Bostick was reassigned away from the front desk and into the switchboard area. Ms. Bostick's overall duties and position would remain unchanged, but her work environment would be adjusted to "create a positive work environment for all involved." This was not intended to be an adverse or disciplinary action. Covington Aff. ¶ 17 (quoting Ex. I at 2), *see also*, Rose Aff. ¶ 13.

4

After receiving this notice, Plaintiff took various paid and unpaid leave. On December 4, 2017, HR Director Covington provided Plaintiff with written notice that her Family Medical Leave Act (FMLA) protections would run out on December 14, 2017. Ms. Covington asked Ms. Bostick to provide an updated provider note and notify the County about whether she intended to return to CCDHS. Covington Aff. ¶ 18.

On December 8, 2017, Ms. Covington received an email from Juwairiyah Foxx, a nurse practitioner assigned to the Cabarrus County Employee Health and Wellness Center, that Plaintiff felt she was ready to return to work on December 14, 2017. Ms. Foxx requested that Ms. Bostick be returned to working at the front desk because of "her anxiety and reported claustrophobia." Covington Aff. ¶ 19.

The same day, CCDHS received a letter from Ms. Bostick's attorney at the time, Mr. Kirk Angel, that Ms. Bostick was scheduled to return to CCDHS on December 14, 2017. This letter claimed that Ms. Bostick suffered "multiple impairments that substantially limit her major life activities." Mr. Kirk Angel explained that the impairments were "caused by anxiety, depression, and claustrophobia." Covington Aff. ¶ 20.

Plaintiff reported back to CCDHS on December 14, 2017. She reportedly became upset and disruptive when she was told she would not be returned to the front desk and left CCDHS without permission. Covington Aff. ¶ 22.

On December 19, 2017, Ms. Foxx notified Ms. Covington that Plaintiff was not planning to return to CCDHS and declined a work release note or reasonable accommodation documentation. *See* Covington Aff. 23.

On December 20, 2017, Ms. Covington sent Ms. Bostick a letter notifying her that Cabarrus County intended to terminate her employment on December 28, 2017 unless she received a clearance letter from the Cabarrus County Health and Wellness Center and returned to work on or before that date. Covington Aff. ¶ 24.

On December 28, 2017, Ms. Covington notified Plaintiff in writing that she was being separated from her employment with Cabarrus County due to her failure to return from medical leave. Covington Aff. ¶ 28.

On February 5, 2018, Cabarrus County received another letter from Mr. Kirk Angel in which he provided a copy of a discrimination charge submitted to the Equal Employment Commission (EEOC) by Ms. Bostick that same day. Covington Aff. ¶ 27.

On March 19, 2018, Ms. Covington received a "Notice of Hearing by Telephone" from the North Carolina Department of Commerce's Division of Employment Security related to Plaintiff's claim for unemployment assistance. The notice included a handwritten "Appeal Request" from Ms. Bostick in which she described the events of December 14, 2017 from her perspective. Covington Aff. ¶ 29. In her appeal, Plaintiff admitted walking out of CCDHS after being denied her preferred accommodation for her claustrophobia, a return to the front desk. *See* Covington Aff., Ex. S at 4.

## ARGUMENT

### A. **Summary of Argument**

Plaintiff is unable to show any violation of the ADA by Cabarrus County as a matter of law. First, Plaintiff filed her complaint in this case late, requiring dismissal. Second, Plaintiff was not a "qualified individual with a disability," nor can she show a discriminatory adverse employment action occurred. Both are prerequisites for asserting a valid discrimination claim under the ADA. Finally, even if Plaintiff was covered by the ADA, Cabarrus County satisfied any obligations it had to provide Plaintiff with reasonable accommodations because Plaintiff's preferred accommodation posed an undue hardship to the County and Plaintiff failed to engage in the interactive process with Cabarrus County that would have helped develop alternative, mutually-agreeable accommodations.

### B. **Summary Judgment Standard**

"Summary judgment is appropriate where evidence in the record 'shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Jefferies v. UNC Reg'l Physicians Pediatrics*, 392 F. Supp. 3d 620, 624 (M.D.N.C. 2019) (quoting Fed. R. Civ. P. 56(a)). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id*. (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "In a motion for summary judgment the moving party satisfies its burden by showing an absence of evidence to support the nonmoving party's case. *Id*. at 625 (citing *Anderson* at 325).

### C.  <u>**Plaintiff's Claims are Barred Because She Filed Her Complaint Late**</u>

Plaintiff's complaint states that she was notified of her Right to Sue by the Equal Opportunity Commission in a letter mailed September 21, 2018. Comp. ¶ 22, ECF No. 2. On December 26, 2018, the Plaintiff filed her complaint. *See* Comp., ECF No. 2. These dates indicate a 96-day gap between the date the EEOC mailed the Right to Sue letter and the day Plaintiff filed suit.

The Americans with Disabilities Act of 1990 (ADA) incorporates Title VII of the Civil Rights Act of 1964's enforcement procedures, 42 U.S.C. § 12117(a), including the requirement that a plaintiff must file a civil action within ninety days after receipt from the EEOC of appropriate notification that conciliation efforts have been unsuccessful. 42 U.S.C. § 2000e-5(f)(1). This is usually accomplished by a Right to Sue letter. *See Sydnor v. Fairfax Cnty.*, 681 F.3d 591, 593 (4th Cir. 2012). A complainant failing to comply with this requirement "generally forfeits his right to pursue his claims." *Quinn v. Copart of Conn., Inc.*, 791 F. App'x 393, 395 (4th Cir. 2019) (citations omitted). Courts "uniformly apply 'this limit strictly and will dismiss a suit for missing the deadline by even one day.'" *Smith v. N. Va. Orthodontics Ctr., LLC* , No. 1:18-cv-1244, 2019 U.S. Dist. LEXIS 119306, at *6 (E.D. Va. July 16, 2019) (quoting *Woodruff V. Peters*, 482 F.3d 521, 525 (D.C. Cir. 2007), *see also Harvey v. City of New Bern Police Dep't*, 813 F.2d 652, 654 (4th Cir. 1987) (holding that Title VII action filed one day after 90-day deadline was untimely). However, the deadline is not jurisdictional, and is thus subject to waiver, estoppel, and equitable tolling. *Zipes v. TWA*, 455 U.S. 385, 393 (1982).

The 90-day filing period begins on the date the Right to Sue letter is delivered, rather than the date of mailing. *See Nguyen v. Inova Alexandria Hosp.*, No. 98-2215, 1999 U.S. App. LEXIS 17978, at *8 (4th Cir. 1999) (citing Harvey, 813 F.2d at 654). The presumed date of delivery of the Right to Sue notice is three days after issuance of the notice by the EEOC. *See Baldwin Cty. Welcome Ctr. v. Brown*, 466 U.S. 147, 148 and n.1 (1984). Plaintiffs can rebut this presumption with contrary evidence. *Scott v. Hampton City Sch. Bd.* , No. 4:14cv128, 2015 U.S. Dist. LEXIS 54823, at *9 (E.D. Va. Apr. 27, 2015) (citing *Nguyen*, 1999 U.S. App. LEXIS 17978, at *3; *Sherlock v. Montefiore Med. Ctr.*, 84 F.3d 522, 525-26 (2d Cir. 1996)). This approach is necessary to accomplish Congress's intent to "require claimants to act expeditiously, without unnecessary delay" by preventing claimants from enjoying an "open-ended time extension, subject to manipulation at will." *Harvey,* 813 F.2d at 654.

The EEOC's Right to Sue letter was mailed on Friday, September 21, 2018, thus Plaintiff is presumed to have received the letter by mail on Monday, September 24, 2018. Ninety days after Monday, September 24, 2018 was Sunday, December 23, 2018. The next business day was Monday, December 24, 2018. The Plaintiff filed her complaint on Wednesday, December 26, 2018. *See* Comp., ECF No. 2. As such, it is untimely and her claim should be dismissed.

While the Plaintiff only missed the deadline by two days, there is no basis on the record to equitably toll the deadline. She had at least 90 days to file her action after receiving the Right to Sue letter, but chose to delay through the entire period. *See Nguyen*

9

at *11. (equitable tolling inappropriate where plaintiff had 80 days to file the complaint); *Watts-Means*, 7 F.3d at 42 (equitable tolling inappropriate where plaintiff had 85 days to file claims); *Harvey*, 813 F.2d at 654 (equitable tolling inappropriate where plaintiff had 84 days to file his complaint).

As such, the Court should find that the Plaintiff's complaint was untimely, and that equitable tolling is inappropriate. Such finding in turn requires dismissal of the claim.

### D.  Plaintiff's Discrimination Claim Fails as a Matter of Law

Plaintiff claims that Defendant Cabarrus County violated the ADA by discriminating against her based on disability. *See* Comp. ¶¶ 24-30, ECF No. 2. It appears she claims that she failed to return from FMLA leave, resulting in her termination, because the County failed to provide her requested reasonable accommodation. As such, though her complaint does not use the exact words, she may be claiming that this constituted constructive discharge, whereby the conditions of her employment were made so intolerable that she was forced to abandon her job.

Since Plaintiff does not offer any direct evidence of intentional disability discrimination, Plaintiff must establish a circumstantial case under the burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Fields v. Verizon Servs. Corp.* , 493 F. App'x 371, 375 (4th Cir. 2012) (citing *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 58 (4th Cir. 1995)). Under this approach, Plaintiff bears the burden of establishing a prima facie case of wrongful

termination. *Id.* (citing *Texas Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252-53, (1981)).

To make a prima facie case of discrimination, "plaintiff must show (1) that she has a disability; (2) that she is a 'qualified individual' for the employment in question; and (3) that [her employer] discharged her (or took other adverse employment action) because of her disability." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 572 (4th Cir. 2015) (quoting *E.E.O.C. v. Stone Pharr Mills, Inc.*, 216 F.3d 373, 377 (4th Cir. 2000)). If Plaintiff meets that burden, then Cabarrus County must then "articulate some legitimate, nondiscriminatory reason" for Plaintiff's dismissal. *Id.* (*quoting McDonnell Douglas*, 411 U.S. at 802) (internal quotations omitted). If Cabarrus County meets that burden, then Plaintiff must then show this otherwise legitimate reason is merely a pretext for discrimination. *See id.* (quoting *Texas*, 450 U.S. at 252-53).

Plaintiff's claim fails prongs two and three because she cannot show she was a "qualified individual" subject to ADA protections or that Cabarrus County discharged her because of her disability. Even if Plaintiff does meet that burden, Cabarrus County terminated Plaintiff's employment because she voluntarily failed to return from unpaid leave, a legitimate, non-discriminatory purpose.

### 1. Plaintiff Was Not a "Qualified Individual" Subject to ADA Protection

No reasonable jury could find that, at the time of her discharge, Plaintiff was a "qualified individual" for the purposes of the ADA. The record shows numerous

11

documented incidents spanning several years showing that Plaintiff was unable to perform the essential functions of her position due to her poor customer service and her disruptive behaviors with other employees.

A qualified individual is an individual "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "Essential duties" refers to "fundamental job duties of the employment position." 29 C.F.R. § 1630.2(n)(1), *see also Harris v. Reston Hosp. Ctr., LLC* , 523 F. App'x 938, 947 (4th Cir. 2013) ("A job function is essential if it bear[s] more than a marginal relationship to the job at issue.") (citations and quotations omitted)). "[C]onsideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8).

The "essential functions of a job" encompass more than just the skills and abilities specific to a position, but also include the other job-related functions inherent in almost any position in the modern workforce. For instance, regular attendance is an essential function inherent in most positions. *See Hannah P. v. Coats*, 916 F.3d 327, 343-44 (4th Cir. 2019) (quoting *Tyndall v. Nat'l Educ. Ctrs.*, 31 F.3d 209, 213 (4th Cir. 1994) ("[i]n addition to possessing the skills necessary to perform the job in question, an employee must be willing and able to demonstrate these skills by coming to work on a regular

12

basis"). Similarly, employers can require employees to demonstrate "certain attributes such as the ability to work with other people or to work under pressure." EEOC Enforcement Guidance: Applying Performance and Conduct Standards to Employees with Disabilities, 2008 WL 4786697, at *2 (Sept. 25, 2008).[1]

Plaintiff had a long record of not being able to perform the essential functions of the position. Most notably, Plaintiff failed to meet the essential functions of the position by failing to return to her position after her FMLA leave expired and she was placed on unpaid leave up to her termination. *See* Covington Aff., Ex. A at 2 (Plaintiff's position required her to "attend work regularly."). Covington Aff. ¶¶ 18, 24, and 26 (showing that Plaintiff failed to attend work regularly). By abandoning her position without further communication, Plaintiff showed herself as unqualified for the position when she was ultimately terminated.

Plaintiff also showed herself as unqualified for the position, with or without reasonable accommodation, by failing to "establish and maintain effective working relationships with associates and guests." Covington Aff., Ex. A at 2. Plaintiff received numerous written warnings related to her failure to maintain good relationships with her coworkers and clients, which adversely effected the team's performance and clients' interactions with CCDHS. *See* Covington Aff. ¶¶ 11-14. This came to a head when CCDHS leadership decided to move her away from the front desk to minimize

---

[1] EEOC Enforcement Guidance documents "constitute a body of experience and informed judgment to which courts and litigants my properly resort for guidance." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986).

disruptions to other employees. *See* Rose Aff., Ex. B. Regardless of whether she was seated at the front desk or elsewhere, Plaintiff showed that she was not able to perform this essential function of her position.

Further, Plaintiff showed herself as unable to "maintain composure, keeping emotions in check, even in difficult positions," which is another essential function of the job. *See* Covington Aff., Ex. A at 2. This requirement is essential because caseworkers must often work with clients who are unable to moderate their emotions themselves amid the stresses of applying for essential government benefits. When faced with an angry client, it falls on the caseworker to respond with reasonable patience and empathy to give the client a chance to have their underlying concerns addressed. Losing control and responding in kind is not an option.

As previously described, Plaintiff had a well-documented history of emotional outbursts and other unprofessional conduct. This is no more apparent than in her admitted outburst on December 14, 2017 when she walked out on her job after being denied a return to the front desk. *See* Covington Aff., Ex. S at 5-6; Covington Aff., Ex. M at 2 ("When Ms. Bostick returned to CCDHS on December 14, she became somewhat upset and disruptive when she was informed she was not allowed to return to her old position at the front desk. A deputy sheriff was contacted to come to the area to intervene and assist with [helping] her leave the premises.").

For all these reasons, Plaintiff Bostick was not a "qualified individual" subject to the protections of the ADA.

### 2. Cabarrus County Did Not Take Adverse Employment Action Against Plaintiff Because of Her Disability

Even if Plaintiff was a "qualified individual" subject to the protection of the ADA, no reasonable jury could find that she suffered an adverse employment action because of her disability. Though it is unclear, Plaintiff seems to allege that Cabarrus County's failure to provide a reasonable accommodation effectively forced her to abandon her position, which led to her termination. If so, she may be alleging constructive discharge. However, nothing on the record supports such an allegation.

"A constructive discharge—an allegation that the employer made the employee's working conditions so intolerable that she was forced to quit her job—may constitute an adverse employment action." *Lacasse v. Didlake, Inc.* , 712 F. App'x 231, 239 (4th Cir. 2018) (citing *Holsey v. Armour & Co*., 743 F.2d 199, 209 (4th Cir. 1984)). "To prove a constructive discharge, the plaintiff must show: (1) that the employer's actions were deliberate, and (2) that working conditions were intolerable." *Lacasse* at 239 (citing *Heiko v. Colombo Sav. Bank, F.S.B.*, 434 F.3d 249, 262 (4th Cir. 2006)). Courts examine whether working conditions are intolerable "from the objective perspective of a reasonable person." *Id*. (quoting *Heiko* at 262) (internal quotations omitted). "[M]ere dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." *Id.* (quoting *Heiko* at 262) (internal quotations omitted).

Nothing on the record suggests that Cabarrus County intentionally forced her out of the position. In fact, after Plaintiff walked off the job on December 14, 2017, Defendant made two attempts to engage with her and facilitate her return. *See* Covington Aff. ¶¶ 22, 24. It is difficult to see how Plaintiff can claim that the County effectively forced her out when it actively sought her return.

Further, no objective reasonable person would find that her working conditions were intolerable. The only thing that would have changed in her working conditions would be moving her seating location from the front desk to call center a few feet away. She would still be performing the same job, for the same compensation, with the title. *See* Covington Aff., Ex. I at 2. There is no material difference in the locations. They were in the same room, with the same furniture, equipment and space afforded for each workstation. The only difference was that caseworkers at the front desk sometimes spoke with clients in person, albeit through a glass barrier, in addition to helping clients via phone, while workers assigned in the call center only helped via phone. *See* Rose Aff. ¶¶ 8-9. Such change in working conditions should have been more than tolerable considering that Plaintiff had experience working in the call center because caseworkers were commonly rotated between this area and the front desk. *See* Rose Aff. ¶¶ 10; Covington Aff. ¶ 10; Covington Aff., Ex. B at 4.

As such, Plaintiff fails to offer any basis indicating that she was constructively discharged from her position. Cabarrus County held her position even after her FMLA leave ran out and engaged with her to coordinate her return, indicating a lack of

discriminatory intent. Nothing on the record shows that her new working conditions in the call center area were intolerable. As such, her likely claim of constructive discharge must fail.

Because no reasonable jury could find that she was a "qualified person" or that Cabarrus County took an adverse employment action against her because of her disability, she fails to make the prima facie case necessary to support her claim of unlawful discrimination.

### 3. Cabarrus County's Termination of Plaintiff was for a Legitimate, Non-Discriminatory Reason.

Assuming, *arguendo*, that Plaintiff established a prima facie case of discriminatory adverse employment action, the burden shifts to Defendant to produce evidence of a legitimate, non-discriminatory reason for terminating Plaintiff. Defendant has met that burden of production. The evidence shows that Cabarrus County discharged Plaintiff after failing to return from FMLA leave. *See* Covington Aff., Ex. Q. This discharge came after attempts to facilitate Ms. Bostick's medical clearance and warnings that Ms. Bostick would be terminated if she did not make arrangement to report to duty. *See* Covington Aff., Ex. O.

No employer can reasonably be expected to hold a position unfilled for that long without any communication from its employee. As such, Cabarrus County's termination of Plaintiff was for a legitimate, non-discriminatory purpose.

17

**E. Cabarrus County Did Not Refuse to Provide Plaintiff with a Reasonable Accommodation.**

Plaintiff also alleges that Cabarrus County failed to provide her a reasonable accommodation. *See* Comp. ¶¶ 24-36, ECF No. 2. Even if the Plaintiff could show that a qualified individual under the ADA, Cabarrus County did not refuse to make such an accommodation because Plaintiff's requested accommodation posed an undue hardship on Cabarrus County. Also, Plaintiff failed to engage in the interactive process necessary to identify alternative accommodations.

The ADA prohibits employers from "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). "A reasonable accommodation is one that 'enables [a qualified] individual with a disability . . . to perform the essential functions of [a] position.'" *Jacobs* at 580 (quoting 29 C.F.R. § 1630.2(o)(1)(ii)).

A failure to accommodate claim under the ADA requires that the plaintiff establish:

> (1) he suffers a disability; (2) his employer had notice of the disability; (3) with reasonable accommodations, he is otherwise qualified to perform the employment position in question; and (4) his employer refuses to make such reasonable accommodations.

*Murphy v. Cty. of New Hanover*, No. 21-1471, 2021 U.S. App. LEXIS 30275, at *2 (4th Cir. Oct. 8, 2021) (citation omitted).

18

Plaintiff cannot meet the burden of the fourth prong of this test because the only accommodation proffered by Plaintiff was objectively unreasonable and the Plaintiff failed to engage in the interactive process necessary to consider other possible accommodations.

## 1. Plaintiff's Preferred Accommodation Would Impose an Undue Hardship on Cabarrus County

Ms. Bostick's preferred accommodation, relocation to front desk, would have imposed an undue hardship on Cabarrus County. Thus, the County was not required to provide such accommodation for her "anxiety and reported claustrophobia," Covington Aff., Ex. K, as a matter of law.

While an employee's preferred accommodation is a relevant consideration when determining an appropriate accommodation, "[a]n employer may reasonably accommodate an employee without providing the exact accommodation that the employee requested." *Reyazuddin v. Montgomery Cty.*, 789 F.3d 407, 415 (4th Cir. 2015) (citing *Hankins v. The Gap, Inc*., 84 F.3d 797, 800 (6th Cir. 1996)), *see also* EEOC Interpretive Guidance on Title I of the Americans with Disabilities Act, 29 C.F.R. pt. 1630 app. at 406 ("the employer providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide").

Further, an employer need not make an accommodation if it "can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business."

19

42 U.S.C. § 12112(b)(5)(A). For the purposes of this exception, "undue hardship" means "significant difficulty or expense incurred by a covered entity." 29 C.F.R. § 1630.2(p)(1). EEOC interpretative guidance explains that "'Undue hardship' refers to any accommodation that would be unduly costly, extensive, substantial, or disruptive, or that would fundamentally alter the nature or operation of the business." 29 C.F.R. § Part 1630 App. (Section 1630.2(p) Undue Hardship).

Plaintiff's sole requested accommodation was that she be returned to the front desk. *See* Covington Aff., Ex. K (letter from Plaintiff's healthcare provider that Plaintiff was "requesting that she be returned to her position as [Income Maintenance Case Worker I] at the front desk instead [of] in the switchboard room."); Covington Aff., Ex. L (letter from Plaintiff's attorney at the time requesting reasonable accommodation of being returned to front desk). Such an accommodation would have posed an undue hardship on Cabarrus County because it would have caused significant disruptions at the front desk area, as had previously occurred. *See* Rose Aff. ¶ 11-13; Covington Aff., Ex. I (finding there "is an obvious dysfunction and tension between [Ms. Bostick] and other staff members within the front desk area, which is creating an uncomfortable working environment and risking customer service to [CCDHS] clients.").

As a result of this "dysfunction", the only reasonable solution was to relocate Plaintiff from the front desk area because she had a well-documented history of poor customer service and unprofessional behavior while working there. *See* Covington Aff. ¶¶ 11-14. Relocating the other workers that had conflicts with Plaintiff to allow Plaintiff

to sit at the front desk would have been unduly disruptive to CCDHS's operations by depriving customers from benefiting from qualified caseworkers and subjecting them to Plaintiff's consistently poor customer service. As such, this was not a reasonable accommodation that Cabarrus County would be expected to provide under the ADA. Cabarrus County was not "refusing to provide reasonable accommodations," as Plaintiff complains, Comp. ¶ 34, ECF No. 2, but simply refused to provide the one unreasonable accommodation that she demanded.

2. **Plaintiff Failed to Participate in the Interactive Process in Good Faith, Thus Preventing Cabarrus County from Evaluating Other Possible Reasonable Accommodations**

Plaintiff never provided Cabarrus County with sufficient information to propose alternative reasonable accommodations as part of the "interactive process" anticipated by the EEOC. As such, Cabarrus County never refused to make a reasonable accommodation, if such accommodation actually existed.

Once an employer becomes aware of an employee's disability that requires a reasonable accommodation, such employer must engage in an informal "interactive process" with the employee to determine the appropriate accommodation. *See* 29 C.F.R. § 1630.2(o)(3)). "This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."*Id.*

21

Both parties must act in good faith to work towards identifying and implementing a reasonable accommodation. *See Crabill v. Charlotte Mecklenburg Bd. of Educ.*, 423 F. App'x 314, 322-23 (4th Cir. 2011). For instance, an employer may not be able to readily identify the appropriate accommodation because the employer does not "know enough about the individual's disability or the limitations that disability would impose on the performance of the job to suggest an appropriate accommodation." 29 C.F.R. § Part 1630 App. § 1630.9. Where there are questions of whether a party met this obligation, "courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary. . . . In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility." *Crabill* at 323 (quoting *Beck v. Univ. of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1135-36 (7th Cir. 1996)).

Cabarrus County's understanding of Ms. Bostick's disabilities is limited. Ms. Bostick did not provide notice of her claimed disabilities and request to be returned to the front desk for those disabilities until December 8, 2017, when her healthcare provider sent a note to the Cabarrus County Human Resources Director about "her anxiety and reported claustrophobia," Covington Aff., Ex. K. The healthcare provider explained that due to these conditions, Ms. Bostick was "requesting that she be returned to her position as [Income Maintenance Case Worker I] at the front desk instead [of] in the switchboard room." Covington Aff., Ex. K. It is important to note that this message did not certify the diagnosis of claustrophobia, but rather acknowledged that it was "reported". Similarly,

22

the healthcare provider did not recommend that Ms. Bostick be returned to the front desk, but rather it just acknowledged that "she is requesting" this accommodation. The message did not indicate any functional limitations caused by these conditions either.

On the same day, Defendant received a letter from Plaintiff's attorney, Mr. Kirk Angel, that Ms. Bostick was scheduled to return to CCDHS on December 14, 2017. *See* Covington Aff. ¶ 22. This letter claimed that Ms. Bostick suffered "multiple impairments that substantially limit her major life activities." Covington Aff., Ex. L. Mr. Kirk Angel explained that the impairments were "caused by anxiety, depression, and claustrophobia." *Id.* Mr. Kirk Angel did not explain the functional limitations that Ms. Bostick endured because of these conditions. Plaintiff admitted in her handwritten appeal to the North Carolina Department of Commerce's Division of Employment Security that these two letters were the sole documentation used to justify her accommodation request. *See* Covington Aff., Ex. S.

As previously explained, returning Plaintiff to the front desk was not a viable option. Plaintiff was informed of this fact when she returned to CCDHS on December 14, 2017. *See* Covington Aff. ¶ 21; Covington Aff., Ex. S at 5. With little information about Plaintiff's disabilities in the two letters provided to support another accommodation, Cabarrus County was unable to propose an alternative reasonable accommodation that day. Nonetheless, Cabarrus County was open to engaging in an interactive process to work towards a solution, but Plaintiff admits that she walked out as soon as CCDHS managers refused to return her to the front desk. *See* Covington Aff., Ex. S at 5-6 ("I then

23

informed them that if they chose to ignore the doctor's recommendation and the lawyer's recommendation I would leave until they could figure out what they needed to do.").

Subsequent attempts by Cabarrus County to engage with Plaintiff on the matter failed to get any response. Cabarrus County Attorney Richard Koch wrote to Plaintiff's attorney the next day asking for more information about her disabilities. Covington Aff. ¶ 22. By December 19, Plaintiff reportedly refused to seek additional documentation from the Cabarrus County Health and Wellness Center to support her requests. *See id.* at ¶ 23. Human Resources Director Lundee Covington reached out to Plaintiff on December 20 and encouraged her to visit the Health and Wellness Center to provide the necessary documentation. *See id.*, Ex. O.

Plaintiff never responded to any of these invitations to constructively engage with the County. Instead, Plaintiff's next response came in the form of one last letter from her attorney at the time notifying the County that she filed a charge with the EEOC. *See* Covington Aff. ¶ 27. Thus, Defendant Cabarrus County had no basis to consider alternative reasonable accommodations.

For these reasons, no reasonable jury could find that Cabarrus County refused to provide Plaintiff with a reasonable accommodation.

## CONCLUSION

Overall, when Plaintiff's supervisors at CCDHS took appropriate actions to address her poor behavior by separating her from complaining coworkers, Plaintiff largely abandoned her job and suddenly pushed a disability discrimination. The record

24

shows that the sole object in asserting this ADA claim was to secure her return to her preferred work location at the front desk. When she failed to return to her position after exhausting months of leave, Cabarrus County was forced to end her employment.

With these facts, a reasonable jury will not be able to find that Plaintiff was in fact discriminated against in violation of the ADA.

Respectfully submitted, this the 15th day of December, 2021.

/s/ David B. Goldberg
David B. Goldberg, NC Bar No. 49229
Deputy Cabarrus County Attorney
PO Box 707
Concord, North Carolina 28026
Telephone: (704) 920-2408
Email: dbgoldberg@cabarruscounty.us

Richard M. Koch, N.C. Bar No. 8360
Cabarrus County Attorney
3320-201 Prosperity Church Road
Charlotte, North Carolina 28269
Telephone: (704) 503-5700
lawoffice@RichardKochLaw.com

ATTORNEYS FOR THE DEFENDANT

IN THE UNITED STATES DISTRCIT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

DEIRDRE L. BOSTICK,

    Plaintiff,

        v.

CABARRUS COUNTY DEPT. OF
HEALTH AND HUMAN SERVICES,

    Defendant.

BRIEF IN SUPPORT OF
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT-
CERTIFICATE OF SERVICE

Case No. 1:18CV1042

 

I hereby certify that on December 15, 2021, I electronically filed the forgoing

BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

with the Clerk of Court using the CM/ECF system, which will send electronic

notification of such filing to all registered users. I also certify that a paper copy has been

mailed to the plaintiff on this date at the following addresses:

Deirdre L. Bostick
5867 Hampton Hills Blvd
Tamarac, Fl 33321-4181

This the 15th day of December, 2021.

/s/ David B. Goldberg
David B. Goldberg, NC Bar No. 49229
Deputy Cabarrus County Attorney
PO Box 707
Concord NC 28026
Telephone: (704) 920-2408
Email: dbgoldberg@cabarruscounty.us

Case 1:18-cv-01042-LCB-JEP   Document 27   Filed 12/15/21   Page 26 of 27

CERTIFICATE OF WORD COUNT

This is to certify that the foregoing brief contains fewer than 6,250 words, after excluding the caption, signature lines, certificate of service and this certificate. Therefore, the foregoing brief complies with the length limitations set by Local Rule 7.3(d)(1). The basis for this certification is the word count feature of the word processing software used to prepare this brief.

/s/ David B. Goldberg
David B. Goldberg, NC Bar No. 49229
Deputy Cabarrus County Attorney
PO Box 707
Concord, North Carolina 28026
Telephone: (704) 920-2408
Email: dbgoldberg@cabarruscounty.us

Case 1:18-cv-01042-LCB-JEP   Document 27   Filed 12/15/21   Page 27 of 27